**BRISTOL–MYERS SQUIBB COMPANY and E.R. Squibb & Sons, LLC, Plaintiffs,**

v.

**TEVA PHARMACEUTICALS USA, INC., Defendant.**

No. 01 Civ.5572(SHS).

United States District Court, S.D. New York.

Oct. 27, 2003.

Pasquale A. Razzano, David F. Ryan, Robert L. Baechtold, Fitzpatrick, Cella, Harper & Scinto, New York City, for plaintiffs.

David M. Hashmall, Frederick H. Rein, Keith A. Zullow, Goodwin Procter, LLP, New York City, Henry C. Dinger, Goodwin Procter, LLP, Boston, MA, for defendant.

## OPINION & ORDER

STEIN, District Judge.

Plaintiffs Bristol–Myers Squibb Company and E.R. Squibb & Sons, LLC, (collectively "Bristol") bring this patent action pursuant to 35 U.S.C. § 271(e)(2), alleging that defendant Teva Pharmaceuticals, USA, Inc.'s proposed fosinopril sodium tablet formulation, as described in Teva's Abbreviated New Drug Application ("ANDA"), infringes claim 1 of Bristol's United States Patent Number 5,006,344 ("the '344 Patent."). Claim 1 of the '344 patent claims, *inter alia,* a stable fosinopril sodium tablet "comprising ... from about 0.3% to about 4% of a lubricant selected from a group consisting of sodium stearyl fumarate and hydrogenated vegetable oil."

Teva contends that its proposed formulation does not infringe the '344 Patent because its formulation does not contain "from about 0.3% to about 4% of a lubricant selected from a group consisting of sodium stearyl fumarate and hydrogenated vegetable oil".

This suit was brought under the procedures set forth in the Drug Price Competition and Patent Term Restoration Act of 1984, also known as the Hatch–Waxman Act ("Hatch–Waxman" or the "Act"). The Act is codified in the Food and Drug Act, 21 U.S.C. § 355 et seq., and in the patent statute, 35 U.S.C. § 271(e)(2). Under Hatch–Waxman, an applicant is permitted to file an ANDA with the United States Food & Drug Administration ("FDA") requesting approval of a bioequivalent version (a "generic" version) of a drug that is currently listed by the FDA as approved for safety and effectiveness (a "listed drug") without having to submit additional safety and efficacy data. 21 U.S.C. § 355(j)(2)(A). The applicant must then make a certification with respect to any relevant patents for the listed drug that it will not market its drug prior to the relevant patent's expiration, or that that patent "is invalid or will not be infringed by the manufacture, use, or sale of the for which the [ANDA] is submitted." 21 U.S.C. § 355(j)(2)(A)(vii)(IV). If the applicant makes the latter certification, it must notify the holder of the patent, who if it disputes that certification, has forty-five days in which to sue the applicant for infringement pursuant to 35 U.S.C. § 271(e)(2). *See* 21 U.S.C. § 355(j)(2)(B)(i), (j)(5)(B)(iii). Such a complaint by the patent holder triggers an automatic stay during which the FDA, by statute, cannot approve the ANDA. This automatic stay is ended by the earlier of (a) a decision of a court finding the patent not infringed or (b) expiration of a 30 month period beginning with the receipt of notice by the patent holder. 21 U.S.C. § 355(j)(5)(b)(iii).

On March 23, 2001, Teva filed ANDA 76–139 with the FDA seeking approval to sell generic versions of Bristol's 10 mg, 20 mg and 40 mg fosinopril tablets. Teva's ANDA included a "Paragraph IV" certification with respect to the '344 patent, by which Teva certified that the manufacture, use, sale or offer for sale in the United States, or importation into the United States, of Teva's fosinopril tablets would not infringe the '344 patent. On May 7, 2001, Bristol received notice of Teva's Paragraph IV certification and a copy of Teva's "Detailed Statement of The Factual And Legal Bases Of Its Opinion That U.S. Patent 5,000,344 Is Invalid, Or Will Not Be Infringed." The attachment to Teva's letter stated that the '344 patent was not infringed either literally or under the doctrine of equivalents. On June 19, 2001—within the 45–day period allowed by statute—Bristol filed a complaint in this Court alleging Teva's infringement of the '344 patent. The filing triggered the 30–month automatic stay during which the FDA, by statute, cannot approve Teva's ANDA.

This action was tried to this Court without a jury in May 2003. After consideration of all the evidence, this Court concludes that plaintiffs have not shown by a preponderance of the evidence that Teva's proposed fosinopril sodium formulation infringes the '344 patent.

## I.  FINDINGS OF FACT

### A.  Background Information

#### (1)  Parties

1.  Bristol–Myers Squibb Company is a corporation incorporated under the laws of Delaware and maintains its headquarters

and principal place of business in New York City. (SF ¶ 3).[1]

2. E.R. Squibb & Sons, LLC is a limited liability company organized under the laws of Delaware and is a wholly-owned subsidiary of Bristol–Myers Squibb Company (Bristol–Myers Squib Company and E.R. Squibb & Sons, LLC are referred to collectively as "Bristol"). (SF ¶ 4).

3. The '344 patent has been assigned to Bristol. (SF ¶ 22).

4. Teva Pharmaceuticals USA, Inc, is a corporation incorporated under the laws of Delaware, and maintains its principal place of business and its corporate headquarters in Pennsylvania. (SF ¶ 5).

### (2) Witnesses

5. Dr. Nemichand Jain is currently employed by Bristol–Myers Squibb Co. and is one of the named inventors of the '344 patent. He is currently Director of the Pharmaceutical Research Institute in Bristol's Department of Pharmaceutics Research & Development. Dr. Jain has been employed by Bristol since 1980 when he started as a Research Investigator. Dr. Jain has two undergraduate degrees: chemistry and mathematics from Nagpur University in India and technology of pharmaceuticals and fine chemicals from the University of Bombay in India. Dr. Jain earned his doctorate in pharmaceutical chemistry from the University of Kansas. (Tr. 53:12–54:18, Jain; JTX 96).[23]

6. Dr. Alexander M. Klibanov is a Professor of Chemistry and Bioengineering at the Massachusetts Institute of Technology ("M.I.T."). Professor Klibanov has been employed by M.I.T. since 1979 and performs research in the area of pharmaceutical formulations, specifically in stability, stabilization, and delivery of pharmaceuticals. He also consults for pharmaceutical and biopharmaceutical companies in the area of tableting and has been a founder of, and scientific adviser to, biopharmaceutical companies. (Tr. 225:2–226:2, Klibanov; PTX 18).[4]

7. Ms. Julia Hrakovsky has been employed by Teva Pharmaceutical Industries since 1991 and is currently a project manager in Teva's Pharmaceutical Research & Development Division in Israel. Ms. Hrakovsky was the project manager for Teva's development of its fosinopril sodium formulation. She has a masters degree in chemical engineering from the Moscow Lomonosov Institute of Fine Chemical Technologies and during her time at Teva has taken advanced courses in pharmacology. (Tr. 492:1–6,11–15, 493:20–494:10, 494: 13–19; 495:3–10, Hrakovsky).

8. Dr. Arthur H. Kibbe is Chair of the Department of Pharmaceutical Sciences at the Wilkes University School of Pharmacy. Dr. Kibbe has an undergraduate degree in pharmacy from Columbia University and a doctorate in pharmaceutics from the University of Florida. Dr. Kibbe was previously the Senior Director of Professional and Scientific Affairs of the American Pharmaceutical Association. While in that position, he served as chairman of a panel appointed by the FDA Commissioner to investigate fairness in the generic drug approval process. Dr. Kibbe is currently chairman of the Pharmaceutical Sciences Advisory Panel for the FDA. (Tr. 635:7–15,636:13–637:10,637:21, 638:8–14, Kibbe;

---

1. SF ¶ 3 refers to Stipulation of Fact ¶ 3.

2. (Tr. 53:12, Jain) refers to Trial Transcript page 13, line 12; he witness was Nechimand Jain.

3. JTX 96 refers to Joint Trial Exhibit 96.

4. PTX 18 refers to Plaintiff's Trial Exhibit 18.

DTX 70).[5]

9. Mr. Andrew Hirt is currently the president and senior scientist for Materials Research Laboratories, Incorporated. Mr. Hirt received an undergraduate degree in physics from Case Institute of Technology. He has been employed in the field of surface analysis since 1977 and has conducted X–Ray Photoelectron Spectroscopy ("XPS") testing on thousands of pharmaceutical tablets. (Tr. 561:8–564:19, 566:1–6, Hirt).

10. Professor Ashutosh Chilkoti was retained by Bristol to review and analyze the two reports produced by Mr. Hirt, # MRL 3074 and # MRL 3089. Professor Chilkoti is an associate professor at Duke University in biomedical engineering. He also is the assistant director of Duke's Center for Biologically Inspired Materials and Material Systems. Professor Chilkoti has experience working with XPS machinery and has published articles regarding XPS analysis. (Tr.737:21–24; 738:11–14; 739:1–8, Chilkoti).

### (3) The '344 Patent In Suit

11. The '344 patent is entitled "Fosinopril Tablet Formulations." Robert L. Jerzewski, Thomas M. Wong, Lewis J. Gryziewicz, Nemichand B. Jain, and Ajit B. Thakur are the named inventors of the claims of the '344 patent. (Tr. 66:16–21, 175:1–8, 178:5–11, Jain) (JTX 1).

12. The '344 patent is "directed to the discovery that by eliminating magnesium stearate as the lubricant during the tableting of fosinopril sodium and instead employing either sodium stearyl fumarate or hydrogenated vegetable oil, tablets having improved stability are obtained." (SF ¶ 28; JTX 1, col.2, lines 3–7).

13. The '344 patent issued on April 8, 1991, from United States Patent Application Ser. No. 543, 629 ("the '629 application"). The '344 patent identifies the '629 application as a continuation-in-part of United States Patent Application Ser. No. 377,683 ("the '683 application"), filed on July 10, 1989, which was abandoned. (SF ¶ 13, 14).

14. There are 24 claims in the '344 patent. Claim 1 of the '344 patent is an independent claim. Claims 2–24 are all dependent upon Claim 1. Only claim 1 is at issue in this litigation. (SF ¶ 18, 20, 26).

15. Bristol asserts that Teva's fosinopril tablet formulation, as set forth in Teva's ANDA, will infringe claim 1 of the '344 patent either literally or pursuant to the doctrine of equivalents. (SF ¶ 19).

16. Teva asserts that its fosinopril tablet formulation, as set forth in Teva's ANDA 76–139, will not infringe claim 1 of the '344 patent either literally or pursuant to the doctrine of equivalents. (SF ¶ 21).

17. Claim 1 of the '344 patent defines: A stable tablet comprising on a weight percentage basis from about 1% to about 25% fosinopril sodium, up to about 25% of a diuretic, from about 30% to about 90% of a filler, from about 2% to about 10% of a disintegrant, from about 1% to about 5% of a binder, or from about 5% to about 15% of a single agent which is both binder and disintegrant, and from about 0.3% to about 4% of a lubricant selected from a group consisting of sodium stearyl fumarate and hydrogenated vegetable oil. (SF ¶ 27) (JTX 1).

18. Fosinopril is an antihypertensive drug which functions by inhibiting the angiotensin converting enzyme ("ACE"), thereby lowering blood pressure. The ACE catalyzes the body's conversion of the protein angiotensin I to angiotensin II, a protein which increases blood pressure.

5. DTX 70 refers to Defendant's Trial Exhibit 70.

Fosinopril's interaction with ACE thereby results in the production of less angiotensin II, and consequently lower blood pressure. (Tr. 59:22–60:11, Jain; Bristol Demonstrative No. 2).

19. Since 1991, Bristol has been marketing 10mg, 20mg, and 40mg fosinopril sodium tablets covered by Claim 1 of the '344 patent under the brand name Monopril®. The Monopril® product is used in the treatment of hypertension and in the management of heart failure. (SF ¶ 23; Tr. 60:12–16, Jain).

20. Worldwide sales of Monopril® are approximately $500 million per year. (Tr. 60:17–61:1, Jain).

### (4) The Formulation of Drugs

21. The three major goals in developing a drug formulation are that the formulation is (1) therapeutically effective, (2) amenable to manufacture in a reproducible and consistent manner, and (3) sufficiently resistant to loss in potency throughout shelf storage (Tr. 90:21–91:9, Jain).

22. Excipients are the inert ingredients that are used in drug formulations. (Tr. 56:21, Jain).

23. Fillers are excipients that provide bulk to the formulation in order for the tablets to be of sufficient size. (Tr. 75:5–6,9–11, Jain).

24. Disintegrants are excipients that cause the rapid break up of the tablet when it is ingested. (Tr. 75:13–15, Jain).

25. Binders are excipients that act as a glue to hold powder particles together to convert fine powders into granular forms. (Tr. 78:2–5, Jain).

26. Surfactants are excipients that interact at the surface of the tablet to promote the dissolution of the active ingredient and absorption into the bloodstream. (Tr. 549:17–19, Hrakovsky; 666:13–19;667:15–668:17, Kibbe).

27. Excipients and active ingredients added before granulation are referred to as "intragranular." Excipients added after granulation are referred to as "extragranular." (Tr. 509:24–510:9, Hrakovsky; 76:3–6, Jain).

28. The mixture of fosinopril granules and excipients just prior to tableting is referred to as the tableting blend. (JTX 40).

29. Pharmaceutical formulators perform compatibility studies to assess if any excipients will chemically react with the drug to cause any degradation of the drug whereby the molecular integrity and functional properties of the drug are changed. (Tr. 57: 10–16,18–20, Jain).

30. It is standard practice for drug formulators to indicate in lab notebooks whether problems occurred in the testing of a formulation. (Tr. 94:20–23; 99:14–22, Jain; Hrakovsky Dep. 54, 6–9).

31. Weight percentage is obtained by dividing the weight of a given substance by the total weight of the mixture multiplied by 100%. (SFs ¶ 45).

### (5) The Function of Lubricants in Drug Formulation

32. Lubricants are excipients that reduce friction between the tablet and tablet press in order to facilitate the ejection of the tablets without sticking to the tablet press during manufacturing. (Tr. 67:14–17,20–25, Jain).

33. "Sticking" is the adhesion of powder to the dies and punches of the tablet press: (Tr. 68:6–7, Jain).

34. "Picking" is the adhesion of powder to the punch face, so that when the tablet comes out of the die, a portion of it is missing, resulting in an unsightly tablet surface. (Tr. 68:13–17, 69:4–6,9–13, Jain).

35. The effectiveness of a lubricant in a formulation can be assessed by visual inspection of the finished tablet and parts of the tablet press during a tableting run. (Tr. 501:21–502:13, 509:12–18, 552:32–553:6, Hrakovsky; Gryziewicz Dep. 110:11–20).[6]

36. Observed sticking or picking indicates that the tablet lubricant does not confer sufficient lubrication to function properly as a lubricant at the percentage used in the formulation tested. (*See* Tr 504:8–15, Hrakovsky; Gryziewicz Dep. 108:10–110:10).

37. The observation of tablet picking or sticking at a small scale indicates that the type of level of lubricant is inadequate, and that problems are also likely to occur at larger scales. (Tr. 502:14–22, Kibbe; Gryziewicz Tr. 109:5–110:10).

38. There are practical limits to the amount of lubricant in a pharmaceutical formulation because too much lubricant can cause tablet "delamination" or "capping." Tablet "capping" is a phenomenon where the top surface of the tablet sticks to the punch press and the tablet splits. (Tr. 98:19–23, 196:11–14, Jain; JTX 15 at 91.)

39. Too much lubricant can also lead to a tablet that does not bind together well and therefore flakes apart. (Tr. 672:7–11, Kibbe).

## B. The Development of Bristol's Fosinopril Tablet Formulation

### (1) Development of the Magnesium Stearate Formulation

40. On November 15, 1988, Bristol filed a New Drug Application ("NDA") with the FDA for a fosinopril formulation that used magnesium stearate as the tablet lubricant. (SF ¶ 24).

41. Bristol began the process of tablet formulation by performing experiments to screen potential excipients for any incompatibility with fosinopril. A March 31, 1985 report of test results showed magnesium stearate to be compatible with fosinopril, but that the lubricant stearic acid caused degradation of fosinopril. JTX 13.

42. From April 1985 to August 1985, Bristol experimented with formulations using magnesium stearate and the hydrogenated vegetable oil Lubritab®. Bristol successfully formulated tablets with both magnesium stearate and hydrogenated vegetable oil. (Tr: 93:7–9, 98:24–99:22, 100:6–101:12, 126:25–127:5, Jain; JTX 4a).

43. In August 1985, Bristol's formulators selected magnesium stearate as the lubricant for use in the NDA because it was the most efficient lubricant, and upon initial evaluation there appeared to be no problems with such a formulation. (Tr: 70:24–25, 101:22–102:25, Jain; JTX 4a).

44. On May 16, 1991, the FDA approved a formulation of Monopril with magnesium stearate as the tablet lubricant. (SF ¶ 25).

### (2) Bristol's Experiments with Glyceryl Behenate

45. After selection of magnesium stearate for clinical trials, Bristol continued to screen other lubricants for potential use in developing a commercial product. (Tr: 103:5–11, Jain).

46. One of the lubricants tested was glyceryl behenate. The glyceryl behenate used by Bristol in its tests was Compitrol 888. (Tr: 103:19–21, 104:6–7, Jain; JTX 5).

---

**6.** (Gryziewicz Dep. 110:11–20) refers to page 110, lines 11–20 of the deposition transcript of Dr. Gryziewicz.

47. Bristol's compatibility testing showed no evidence of interaction between glyceryl behenate and fosinopril that would lead to drug instability (Tr: 105: 12–13, Jain; JTX 25).

48. On May 27, 1986, Bristol researchers prepared a formulation with 2.0% glyceryl behenate. There are no reported sticking or picking problems for the test of this formulation in the comment section of lab notebook I–359–60. (Tr. 106:6–107:2, 127:3–9, 190:21–22, Jain; JTX 5a).

49. The Batch Records for the I–359–60 formulation are blank. They do not indicate the number of tablets actually produced or whether tableting performance was evaluated. (DTX 64; Tr. 197:2–23, Jain).

50. Bristol utilized tablets from the I–359–060 formulation to conduct long-term stability tests. The test results showed that tablets manufactured with glyceryl behenate showed improved stability compared to tablets manufactured with magnesium stearate. (JTX 8, at BMS–FS 2241) (Tr. 125:23–25, Jain).

51. On June 17, 1986, Bristol tested a formulation with 4.0% glyceryl behenate and reported picking of tablets after approximately 500 counts, which is considered quite early in a tableting run. (JTX 5 at Bristol–FS 2039; Tr. 200:25–201:14, Jain).

52. On June 7, 1986, Bristol tested a formulation with 7.7% glyceryl behenate and reported "some picking." (JTX 5a). The granulation used in this experiment used water as the granulate solvent as opposed to alcohol, which was used in the other formulations. (Tr. 109:20–23, Jain).

53. On June 11, 1986, Bristol tested formulations with a higher concentration of fosinopril using a combination of magnesium stearate and glyceryl behenate as lubricant. A test with 0.3% magnesium stearate and 2.0% glyceryl behenate as the lubricants found picking problems. When additional glyceryl behenate was added to increase the percentage of glyceryl behenate to 3.9%, researchers reported "still more picking." (Tr. 107:18–22, 108:17–22; 198:7–199:17, Jain; JTX 5a, 68).

54. The Court finds that it cannot be established from these test results that Bristol was successful in its efforts to use glyceryl behenate as a sole lubricant in formulating fosinopril tablets.

55. At trial, Dr. Jain testified that experimentation with glyceryl behenate ceased because magnesium stearate had already been selected as the lubricant for its commercial tablet development. (Tr. 112:3–15, Jain).

56. At his deposition, prior to trial, Dr. Jain had testified that his development team discontinued the use of glyceryl behenate as a fosinopril tablet lubricant because of picking problems. (Tr. 202:24–203:6, Jain (referring to Jain Dep. 209:21–210:2)). The Court finds Dr. Jain's deposition testimony on this issue to be more credible than his trial testimony.

57. After Bristol discovered a long-term stability problem with the magnesium stearate formulation (*see infra* ¶ 59), it did not resume experimentation with glyceryl behenate. (JTX 6, 8). The Court finds that this decision is inconsistent with Bristol's claim that its experimentation with glyceryl behenate had been successful.

58. The Court concludes that Bristol discontinued experimentation with glyceryl behenate as a lubricant because of the picking problems evident from the test results, and not for some other reason.

### (3) Development of '344 Patent Formulation

59. In a report dated August 26, 1987, Bristol summarized the results of its long-

term stability studies on fosinopril pills using the magnesium stearate formulation. The main finding was an unexpected loss in potency in the formulation after 17 months. (JTX 14; Tr. 114:23–115:12).

60. Bristol determined that the instability of the magnesium stearate formulation tablets was caused primarily by the interaction of magnesium stearate with fosinopril. Therefore, Bristol decided to replace magnesium stearate as a lubricant. (JTX 12, 15; Tr. 119:23–120:13).

61. By January 1988, Bristol had selected sodium stearyl fumarate and hydrogenated vegetable oil as the substitute lubricants used in efforts to create stable formulations of fosinopril. (JTX 14, 15. Tr. 120: 7–21).

62. Bristol successfully formulated batches with Duratex®, a hydrogenated vegetable oil, and sodium stearyl fumarate. (JTX 6a, 8a).

63. Bristol decided to use sodium stearyl fumarate as the primary lubricant and hydrogenated vegetable oil as a backup. Bristol selected sodium stearyl fumarate based on its lubricating efficiency and compatibility with fosinopril. (Tr. 127:20–128:6; JTX 16)

64. On March 16, 1992, Bristol filed a Supplemental New Drug Application ("SNDA") with the FDA for approval of a fosinopril formulation with sodium stearyl fumarate as the lubricant. On September 22, 1992 the FDA approved Bristol's SDNA. (JTX 17, 18)

## C. Teva's Fosinopril Tablet Formulation

65. Teva's ANDA 76–139 sets forth the formulations of the fosinopril tablets (10, 20, 40 mg) for which Teva seeks FDA approval. Teva's 10 mg, 20 mg, 40 mg fosinopril tablets, when commercially sold, will utilize the 10mg, 20 mg, and 40 mg

formulations set forth in ANDA 76–139. (SF ¶ 43).

66. Teva's formulation for all dosages of its fosinopril tablets contains, by weight, 4.0% sodium lauryl sulfate and 2.4% glyceryl behenate. (SF ¶ 46).

67. In Teva's ANDA, sodium lauryl sulfate and glyceryl behenate are each identified as "lubricant" under pharmaceutical function. (SF ¶ 47).

68. The brand name of glyceryl behenate used in Teva's fosinopril tablet formulation is Compitrol® 888 ATO. (SF ¶ 57).

## (1) Development of Teva's Formulation

69. Teva's formulators prepared numerous experiments with glyceryl behenate 2.4% as the sole lubricant. (Tr. 497:10–14, Hrakovsky; SF ¶ 42).

70. Teva's formulators observed sticking during tableting of each of the formulations prepared with 2.4% glyceryl behenate as the sole lubricant. (JTX 60 at TFS 6128–36, 6145–53,6179–88,6200–08; Tr. 497:15–19, 498:5–501:20, Hrakovsky).

71. Teva concluded from the above experimental batches that 2.4% glyceryl behenate as the lubricant "was not enough to provide lubrication needed." (JTX 64 at TFS 4772; Tr. 504:8–25, Hrakovsky).

72. Teva did not experiment with more than 2.4% glyceryl behenate in its fosinopril tablets because it had a policy of limiting the experimental use of an excipient to an amount that had already been used in an earlier Teva product that had received FDA approval in order to expedite regulatory approval. If Teva used more than 2.4%, the highest concentration of glyceryl behenate previously used in one of the Teva products, it would have to submit a supplementary toxicity study to the FDA as part of its ANDA. (Tr. 297:14–17, Kliba-

nov; Tr. 505:1–19, Hrakovsky; Jaskot Depo. Tr. p. 65:7–16; 66:2–15).

73. To achieve a commercially acceptable level of lubrication, Teva combined sodium lauryl sulfate with glyceryl behenate. (Tr. 506:9–507:10, 521:22–523:1, 526:1–8 Hrakovsky; JTX 60, 64).

74. Teva observed no sticking or picking in its tableting runs using glyceryl behenate & sodium lauryl sulfate as a lubricant combination. (JTX 91–93; 52–53).

### (2) Teva's Manufacturing Process

75. Teva's proposed fosinopril tablets are manufactured by employing a wet granulation process. (SF ¶ 49).

76. In Teva's manufacturing process, fosinopril tablets are manufactured using a multi-step process during which the active ingredient, fosinopril sodium, is blended with excipients. (SF ¶ 50).

77. Teva's fosinopril manufacturing process can be described in two parts. In the first part, fosinopril sodium is mixed with excipients to produce a granulate. In the second part of the process, excipients are blended with the granulate before being compressed into tablets. (Tr. 509:24–510:9, Hrakvosky).

78. The intragranular excipients used by Teva are fosinopril sodium, lactose anhydrous, povidone and crospovidone. These ingredients are mixed with isopropyl alcohol in a high sheer mixer containing a chopper to form the granulate. The granulate is then dried and milled. (JTX 40).

79. The extragranular excipients used by Teva during the second part of the process are sodium lauryl sulfate, Avicel (microcrystalline cellulose), and glyceryl behenate. (JTX 40).

80. Sodium lauryl sulfate contains lumps of agglomerates, and therefore requires screening before it is added to the tableting blend. In order to facilitate screening, the filler Avicel is used as a carrier for sodium lauryl sulfate. (Tr. 510:24–511:19, Hrakovsky).

81. After being screened, the sodium lauryl sulfate and Avicel are blended together with the granules for 5 minutes. (Tr. 510:24–511:13).

82. In the final pre-tableting step of Teva's process, solid particles of glyceryl behenate, after being screened, are added to the mixture of fosinopril granules, sodium lauryl sulfate and Avicel and the mixture is blended for 20 minutes. (JTX 40; Tr. 510:24–511:13, Hrakovsky; 661:17–662:11, Kibbe).

83. Extragranular excipients are blended with the granulate in a device called a Flow Bin. A Flow Bin is an empty pyramidal drum which has no blades and rotates at the speed of 10 revolutions per minute, blending the granulate with the extragranular excipients. (JTX 64; Tr. 512:2–11, Hrakovsky).

84. The blending is deliberately gentle to avoid breaking down the granules. The purpose of the blending process is to assure a uniform distribution of the particles in the blend. (Tr., 510:17–23, Hrakovsky; 660:5–15, 661:6–663:7 Kibbe).

### D. Construction of Claim 1 of the '344 Patent

85. The relevant date for purposes of claim construction is July 10, 1989, the filing date of the '683 application (the first application in the chain of applications that ultimately issued as the '344 patent). (SF ¶ 29).

86. The relevant art with regard to claim 1 of the '344 patent is the art of pharmaceutical formulation. (SF ¶ 30).

87. A person of ordinary skill in the art of pharmaceutical formulation is someone

with a degree in pharmacy, chemistry, chemical engineering or mechanical engineering who obtains advanced training either through an advanced degree in pharmaceutical sciences or on-the-job training working with experienced formulators. (Tr. 653:23–654:2, 688:11–15, 689:23–690:5 Kibbe).

### (1) The United States Pharmacopeia/National Formulary

88. The United States Pharmacopeia/National Formulary, Sixteenth Edition (USP/NF) is a compendium of monographs for excipients that are acceptable for use in drug products in the United States. (Tr. 155:19–22, Jain; 645:3–15, 648:4–25 Kibbe).

89. A monograph on a product listed in the USP/NF describes the listed product and sets forth specifications for use of that product in pharmaceutical formulations. (Tr. 645:10–15, Kibbe; 71:8–13, Jain).

90. The USP/NF monograph development process is as follows: An expert panel of volunteers from the pharmaceutical industry, FDA and academia draft and review a proposed new USP/NF monograph for a pharmaceutical substance. The proposed monograph is then published in the Pharmaceutical Forum, which allows industry wide comment on the monograph before it is officially adopted. (Tr. 647:1–17, Kibbe; JTX 73, Preface).

91. The USP/NF describes the properties a product must satisfy to meet USP/NF standards. Only products that meet USP/NF standards may be referred to as "USP/NF," and can be designated by placing the letters "USP" or "NF" after the name of the material. (Tr. 649:23–650:2, 650:20–651:21, Kibbe; 71:3–13, Jain; DTX 69; JTX 73, Preface).

92. The Federal Food, Drug, and Cosmetic Act ("FDCA"), which empowers the FDA to enforce the FDCA, defines "drug" through reference to the USP/NF: "The term 'drug' means (A) articles recognized in the official United States Pharmacopeia . . . or official National Formulary, or any supplement to them . . ." (21 U.S.C. § 321(g)(1)(A)). Excipients are regulated in the same manner as drugs. (21 U.S.C. § 321(g)(1)(D)).

93. As of July 10, 1989, persons of ordinary skill in the art of pharmaceutical formulation would have known that before an excipient could be used in a pharmaceutical formulation, it would have to meet FDA requirements, and that excipients that meet USP/NF definitions satisfy FDA requirements. (Tr. 334:24–335:6, Klibanov; 644:24–645:9, Kibbe).

94. In order to use an excipient that is not USP/NF, a formulator must provide the FDA with data showing that the excipient was safe for human consumption. (Tr. 73:24–74:12, Jain).

95. USF 21/NF 16 issued in 1985 and was still in effect in 1989. Supplement 5 to USF 21/NF 16 was in effect in 1989: SF ¶ 32.

96. As of July 10, 1989, a person of ordinary skill in the art of pharmaceutical formulation would have been familiar with the USP/NF and its supplements. (SF ¶ 31; Tr. 648:4–25, Kibbe; JTX 73).

97. The USP/NF is used by pharmaceutical formulators as a glossary of terms. When a pharmaceutical formulator reads a reference to a material with a monograph in the USP/NF, the formulator concludes that the material conforms to the monograph unless the author specifies to the contrary. (Tr. 648:4–650:18, Kibbe).

98. The Court concludes that as of July 10, 1989, the monographs of the USP 21/NF 16 and Supplement 5 to the USP 21/NF 16 would establish the plain and ordinary meaning of excipients for a per-

son of ordinary skill in the art of pharmaceutical formulation.

### (2) "Hydrogenated Vegetable Oil"

99. The term "hydrogenated vegetable oil" is not explicitly defined in the claims, the specification, or the prosecution history of the '344 patent. (JTX 1;JTX 2; JTX 3).

100. Hydrogenated vegetable oil was well known by persons of ordinary skill in the art as a tablet lubricant in 1989. (SF ¶ 38).

101. Teva's proposed definition is taken from the monograph for hydrogenated vegetable oil in the USP/NF that was applicable on July 10, 1989, which defined "hydrogenated vegetable oil" as: "refined, bleached, hydrogenated, and deodorized vegetable oil stearins consisting mainly of the triglycerides of stearic and palmitic acids." (JTX 74).

102. This definition of hydrogenated vegetable oil is the same in all editions of the USP/NF published between 1975 and 1990 (Tr. 442:1–4,442:15–443:11, Klibanov; DTX 67; DTX 68; JTX 74; JTX 76).

103. Bristol's proposed definition for "hydrogenated vegetable oil" is: (1) a mixture (2) of mono-/di- and triglycerides (3) derived or isolated from plant sources (4) whose fatty acid moieties are partially or completely hydrogenated and (5) whose fatty acid carbon chain lengths range from 12 to 22. (Tr. 244–252, Klibanov).

104. Professor Klibanov testified that he derived Bristol's proposed definition of "hydrogenated vegetable oil" from the common meaning of the words "hydrogenated" and "vegetable oil," and two dictionaries: Hawley's Condensed Chemical Dictionary (JTX 86) and Webster's New Collegiate Dictionary (JTX 85). (Tr. 244:11–19, Klibarlov).

105. Hydrogenation is the addition of a hydrogen molecule to an organic compound composed of carbon-carbon double bonds. A "hydrogenated" compound has had carbon-carbon double bonds replaced by carbon-carbon single bonds and additional carbon-hydrogen bonds. When all of a compound's carbon-carbon double-bonds have been hydrogenated, it is called "fully hydrogenated" or "saturated." If a compound still has remaining carbon-carbon double-bonds, it is called "partially hydrogenated" or "unsaturated." (Tr. 248 4–6, 249:23–250:5, 250:3–15, Klibanov; JTX 86).

106. The Chemical Condensed Dictionary (10th ed.1981) defines "vegetable oil" as "an oil extracted from the seeds, fruit or nuts or plants and generally considered to be mixtures of mixed glycerides." (JTX 86).

107. A person of ordinary skill in the art of pharmaceutical formulation would not look to chemical or general dictionary definitions of the individual components of the compound term "hydrogenated vegetable oil" before consulting pharmacological reference material that contained definitions of the entire term. (Tr. 326:21–327:11, 327:25–329:4, Kibbe).

108. Because hydrogenated vegetable oil had an USP/NF monograph in 1989, a person of ordinary skill in the art of pharmaceutical formulation would have looked to the monograph of hydrogenated vegetable oil in the USP 21/NF 16 in order to determine what the '344 patent referred to as "hydrogenated vegetable oil." (Tr. 648:4–651:21, Kibbe; DTX 69).

109. A person of ordinary skill in the art of pharmaceutical formulation would have expected the '344 patent to expressly indicate any intent for "hydrogenated vegetable oil" not to conform to hydrogenated vegetable oil NF. (Tr. 648:4–651:21, Kibbe; Tr. 178:5–179:1 (referring to Gryziewicz

Dep. 103:12–104:2), 179:20–180:11 (referring to Wong Dep. 200:20–201:8), Jain).

110. The '344 patent does not define the term "hydrogenated vegetable oil" or expressly indicate in any way that the inventors intended the term "hydrogenated vegetable oil" to refer to a product that does not conform to hydrogenated vegetable oil NF. (JTX 1; Jerzewski Dep. 191:16–23; Wong Dep. 151:20–153:19.)

111. The hydrogenated vegetable oil used by Bristol in its experimental work that led to the tablets claimed in the '344 patent was Lubritab® and Duratex®. Both conformed to hydrogenated vegetable oil NF. (SF ¶¶ 33–35).

112. The hydrogenated vegetable oil used as a lubricant in Example 16 of the patent was Lubritab ®, which conformed to hydrogenated vegetable oil NF. (SF ¶¶ 34, 36).

113. Claim 1 of the '344 patent used the same term as Example 16, "hydrogenated vegetable oil." Therefore, the term "hydrogenated vegetable oil" refers to the same material in Example 16 and claim 1. (*Compare* JTX 1 col. 6, lines 15–21 *to* col. 6, lines 52–61).

114. Bristol's researchers used the terms "hydrogenated vegetable oil" and "hydrogenated vegetable oil NF" interchangeably in staff and quarterly reports during the course of the fosinopril project, and understood in all cases that the term "hydrogenated vegetable oil" referred to hydrogenated vegetable oil NF (Tr. 182:9–23, Jain).

115. The inventors of the '344 patent testified at their depositions that they did not understand hydrogenated vegetable oil to encompass the broad definition proposed by Klibanov; specifically they did not understand hydrogenated vegetable oil to include glyceryl behenate. (Tr. 159:8–18, 173:3–16, 175:1–8, 176:14–15 Jain; Jain Dep. Tr. 239:8–241:6; Thakur Dep. Tr. 238:7–18).

116. The Court finds that Dr. Jain's trial testimony that he would have testified differently at his deposition had he known "what glyceryl behenate was" is not credible. (Tr. 219:15–25, 113:6–12, Jain)

117. The Court concludes that the deposition testimony of the inventors to be an accurate reflection of their understanding of the definition of "hydrogenated vegetable oil".

118. The Court finds that as July 10, 1989, the plain and ordinary meaning of "hydrogenated vegetable oil" for purposes of pharmaceutical formulation was "refined, bleached, hydrogenated, and deodorized vegetable oil stearins consisting mainly of the triglycerides of stearic and palmitic acids."

### (3) "Lubricant"

119. Pharmaceutical tablets containing a lubricant were well known by persons of ordinary skill in the art by 1989. (SF ¶ 37).

120. The '344 specification does not explicitly define the term "lubricant": JTX 1

121. The '344 patent specification implicitly defines the term "lubricant" by describing its function. It is a substance added during the manufacture of tablets having the function of reducing problems such as sticking to the punch tips during tableting. (JTX 1, col.2, lines 10–13).

122. Lubricants perform this lubricating function by interposing a film of low shear strength at the interface between the granular mixture and the tablet-making machinery. (Tr. 304:6–12 Klibanov; 730:10–11, Kibbe; PTX 14 at 169).

123. The expert opinion of both Bristol and Teva's experts is that an excipient is identified as a lubricant when it performs a

lubricating function in a particular formulation. If an excipient lubricates in a particular formulation, it is a lubricant. (Tr. 378:22–379:5, Klibanov)(Tr. 669:3–4, Kibbe).

124. Prof. Klibanov also testified that an excipient that "contributes to lubrication" is not necessarily a lubricant. He defined a lubricant as an excipient which, "when present alone-meaning in the absence of other lubricants," is able to reduce the ejection forces for the tablets and the amount of sticking and picking. (Tr. 304: 6–12, 388: 23–25 Klibanov).

125. While water-soluble lubricants possess less lubricity than water-insoluble lubricants, they can benefit from synergism when used in combination with water-insoluble lubricants. Water-soluble lubricants are considered to be functioning as lubricants in these circumstances (Modern Pharmaceutics, eds. G. Banker and C. Rhodes 2d ed.1989 at 382 (JTX 94)).

126. The Court finds that the plain and ordinary meaning of "lubricant" for a person of ordinary skill in the art of pharmaceutical formulation to be "a substance added during the manufacture of tablets having the function of reducing problems such as sticking to the punch tips during tableting." The Court finds that the plain and ordinary meaning of "lubricant" does not exclude a substance added to "contribute to lubrication" that in isolation from other lubricants would not sufficiently lubricate the tablet.

### E. Sodium Lauryl Sulfate Acts as a Lubricant in Teva's Formulation

127. Sodium lauryl sulfate was well known by persons of ordinary skill in the art as a tablet lubricant and a surfactant by 1989. (SF ¶ 41).

### (1) The Addition Of Sodium Lauryl Sulfate Improved The Lubrication Of Teva's Formulation.

128. During Teva's formulation development, Teva's formulators prepared numerous experimental fosinopril tablet formations using 2.4% glyceryl behenate (by weight) as the sole tablet lubricant. Teva's formulators observed sticking during tableting of each of the formulations. (Tr. 497:10–19, 498:4–501:20, Hrakovsky).

129. Teva concluded that 2.4% glyceryl behenate was insufficient to provide the necessary lubrication to the tablets. (JTX 64).

130. Teva decided to experiment with sodium lauryl sulfate as a lubricant in fosinopril formulations based on the past success of one its researchers using sodium lauryl sulfate in combination with magnesium stearate. (Tr., Hrakovsky 505:25–506:8).

131. Teva's experiments with a combination of 2.4% glyceryl behenate and 4.0% sodium lauryl sulfate produced formulations with acceptable lubrication. (JTX 64; Tr. 508:4–509:3, Hrakovsky; 661:3–5,678:5–679:16, Kibbe).

132. As a result, the Court finds that the addition of sodium lauryl sulfate improved the lubrication of Teva's formulation.

### (2) Sodium Lauryl Sulfate Was Not Used As A Surfactant In Teva's Fosinopril Formulation.

133. Bristol's expert, Dr. Klibanov, testified that sodium lauryl sulfate was being used as a surfactant in Teva's fosinopril formulation. (Tr. 303:12–304:3, Klibanov).

134. Sodium lauryl sulfate NF and glyceryl behenate NF are identified as lubricants in Teva's ANDA: (SF ¶ 47).

135. Teva's contemporaneous laboratory notebooks records describe sodium lau-

ryl sulfate as a lubricant. (Tr. 506:15–507:5, Hrakovsky).

136. Surfactants are excipients that interact at the surface of the tablet to promote the dissolution of the active ingredient. (*see supra* ¶ 26). Because fosinopril is a soluble material, there was no reason for Teva to add a surfactant into its formulation. (Tr. 549:13–21, Hrakovsky, 670:4–9, Kibbe).

137. Bristol's Monopril® product does not contain a surfactant. (Tr. 549:11–12, Hrakovsky).

138. As a result, the Court finds that sodium lauryl sulfate was not used as a surfactant in Teva's formulation.

### (3) Teva's Order Of Addition In The Manufacturing Process Is Consistent With Sodium Lauryl Sulfate Being A Lubricant

139. Materials within a granule are tightly bound to each other by a binder. In contrast, extra-granular excipients make only a loose mixture. (Tr. 86:17–25, Jain)

140. The key aspect of lubricant blend order is that the lubricant is added extragranularly. The extra-granular addition of lubricants promotes their presence around the surfaces of the drug formulation granules and at the metal surfaces of the tableting press for effective lubrication. (Tr. 664:13–22, 665:19–666:6, Kibbe; 200:11–24, Jain).

141. A lubricant does not have to be added at the very last step to function as a lubricant as long as it is added extra-granularly. (*Id.*)

142. Surfactants are added to pharmaceutical tablet formulations during the granulation step. (Tr. 667:25–668:17, Kibbe).

143. Sodium lauryl sulfate is added extra-granularly in Teva's manufacturing process. (JTX 40).

144. As a result, the Court finds that Teva's order of addition in its manufacturing process is consistent with sodium lauryl sulfate being used as a lubricant in Teva's formulation.

### (4) Professor Klibanov's Thermodynamic Hypothesis Lacks Support

145. Bristol's expert, Professor Klibanov, testified that because of thermodynamic principles, the sodium lauryl sulfate in Teva's fosinopril tablets is completely covered by glyceryl behenate, and therefore does not function as a lubricant. (Tr. 308:16–311:6, Klibanov)

146. Because of thermodynamic principles, hydrophilic materials "like to be in contact with other hydrophilic materials" while hydrophobic materials "like to be in contact with other hydrophobic materials." (Tr. 309:6–12, Klibanov).

147. Sodium lauryl sulfate has a hydrophilic head, made up of sodium, sulfur and oxygen, and a hydrophobic saturated fatty acid tail, made up of carbon and hydrogen. (Tr. 309:14–19, Klibanov).

148. According to Klibanov, the granules produced by Teva's mixing process are very hydrophilic and glyceryl behenate is hydrophobic. (Tr. 309:20–310:16, Klibanov).

149. Therefore, Klibanov concludes that sodium lauryl sulfate will be sandwiched between the glyceryl behenate and the fosinopril granules, with its hydrophilic head in contact with the granules, and its hydrophobic tail covered by glyceryl behenate. (*Id.*)

150. Professor Klibanov's hypothesis posits that the sodium lauryl sulfate and glyceryl behenate particles are broken down into layers of molecules and super

molecule particles. (Tr. 398: 12–16, Klibanov).

151. In forming his opinion that the sodium lauryl sulfate in Teva's fosinopril tablets is completely covered by glyceryl behenate, Prof. Klibanov believed that these particles would be reduced in size by "blades" in Teva's blending equipment. (Tr. 398:1–399:4,400:21–23,401:23–402:7, Klibanov). However, Teva blends its extragranular excipients together with the granulate in equipment which has no blades. (*see supra* ¶ 83).

152. Prof. Klibanov testified that the particle reduction would occur even in the absence of blades, due to the shear forces in Teva's manufacturing process. Prof. Klibanov did not calculate what the shear forces would have to be to achieve size reduction, did not calculate the actual shear forces, and did not know the revolutions per minutes of Teva's blending equipment, which would impact the amount of shear forces and particle breakdown. (Tr. 398:1–399:4, 400:4–14, Klibanov).

153. Prof. Klibanov did no calculations or tests to support his thermodynamic hypothesis, either before or after submitting his expert reports. (Tr. 406:21–407:4, 408:21–409:1, 410:24–411:11, Klibanov).

154. As a result, the Court finds that Prof. Klibanov's thermodynamic hypothesis lacks sufficient factual support to establish that the sodium lauryl sulfate in Teva's fosinopril tablets is completely covered by glyceryl behenate and therefore cannot function as a lubricant.

**(5) XPS Shows Sodium Lauryl Sulfate On Surface**

155. X–Ray Photoelectron Spectroscopy ("XPS") is a technique using a chargeless energy source to excite a specimen. X-rays are emitted from the X-ray tubes, giving energies around 1250 or 1450 volts.

The energy gets transferred to an inner shell electronic atom somewhere in the sample, which then gets picked up by an electron in the sample specimen. That electron can leave its atom, and if the atom is close to the surface, the electron will have enough energy to escape the sample and then travel along a path outside the surface toward the analyzer. (Tr. 569:13–25, Hirt) (Bristol Demonstrative No. 19).

156. XPS testing is a reliable method for determining whether a chemical element is present in a region at or near the surface of a tablet. (Tr. 567:3–5, 567:13–19, Hirt).

157. Bristol's XPS expert, Professor Chilkoti, agreed that normal take-off XPS is a reliable method for surface analysis, even on a rough surface such as Teva's fosinopril tablet. (Tr. 755:16–19, Chilkoti).

158. The XPS testing was conducted on 10,20, and 40 mg tablets of Teva's fosinopril tablets. Hirt conducted XPS testing on the top surface of a first tablet, the bottom surface of a second tablet, and a side surface of a third tablet. (Tr. 586:14–16, 588:6–18; Hirt).

159. Sodium lauryl sulfate is the only sulfur-containing compound in Teva's fosinopril tablet formulation. (Tr. 556:10–16, Hrakovsky; 630:9–21, Hirt; 673:4–19, Kibbe; 763:2–8, Chilkoti; JTX 51).

160. Detection of sulfur (in the form of sulfate) at the surface of Teva's fosinopril tablets would indicate that sodium lauryl sulfate is at the surface of the tablets and therefore not precluded from acting as a lubricant. (Tr. 670:10–671:3, 673:4–25, Kibbe).

161. The "mean free path" is related to the energy of the escaping electrons that are detected by XPS. Electrons that have low kinetic energies will come from the shallower mean free paths while electrons with high kinetic energies will come from

deeper mean free paths. (Tr. 585:15–17, Hirt). The "mean free path" essentially describes the depth from which particular electrons measured by XPS escape the surface. (Tr. 631:2–6, Hirt).

162. To calculate a mean free path, Hirt uses a program provided by the National Institute for Standards and Technologies which calculates the path based on the material being analyzed and the kinetic energy of the electron of interest. (Tr. 585:19–23, Hirt).

163. The average mean free path for organic compounds is approximately 40 angstroms. The mean free path for the sulfur found in sodium lauryl sulfate is approximately 37 angstroms. (Tr. 572:21–573:12; 606:19–23, Hirt).

164. In normal-angle XPS testing, 63% of the signal that is seen comes within the first mean path, 88% within two mean paths, and 95% within three mean paths. (Tr. 631:7–15, Hirt; 744:10–745:13, Chilkoti).

165. Therefore, approximately 63% of the signal for sulfur measured by Hirt came within the top 37 angstroms of the tested tablets, approximately 88% within the top 74 angstroms of the tablets and approximately 95% within the top 111 angstroms of the tablet. (Tr. 572:21–573:1, 606:19–23, 631:7–15, Hirt).

166. The normal-take off XPS results show that sulfur is present within the top 100 angstroms of Teva's tablets. The XPS results also indicate that sulfur is most likely present within the top 40 angstroms of Teva's tablets. (Tr. 595:1–596:17, Hirt; DTX 16; see Tr. 765:1–3, Chilkoti).

167. The XPS results demonstrated that that the source for the sulfur in the sampled part of the tablet was sodium lauryl sulfate, and not an atmospheric contaminant. (Tr. 630:15–21, Hirt).

168. Therefore, Mr. Hirt's normal take-off XPS results demonstrate that sodium lauryl sulfate is present to a depth of at least 100 angstroms, and most likely present to a depth of at least 40 angstroms. (Tr. 595:1–596:17, Hirt; DTX 16; see Tr. 765:1–3, Chilkoti).

169. The amount of sodium lauryl sulfate at the surface of Teva's fosinopril tablets, as detected by normal take-off angle XPS, ranged from approximately 45–75% of the amount that would have been present in a pure sample of sodium lauryl sulfate. (See DTX 16; Tr. 572:3–20, Hirt).

170. The particle size of glyceryl behenate is reported to be 5 to 50 microns (50,000 to 500,000 angstroms): (JTX 26g).

171. Even if some glyceryl behenate particles could fragment into smaller particles during blending at 10 RPM in Teva's blender despite the absence of blades, the size of such fragmented particles would still be on the order of microns, not angstroms. (Tr. 726:18–727:24, Kibbe).

172. If glyceryl behenate particles were covering all of the particles of sodium lauryl sulfate at the surface of Teva's fosinopril tablets, no sulfur from sodium lauryl sulfate would or could be detected within 100 angstroms from the surface. (Tr. 673:4–25, Kibbe).

173. As a result, this Court concludes that sodium lauryl sulfate is present on the surface of Teva's fosinopril tablets.

174. This Court finds that the sodium lauryl sulfate in Teva's fosinopril tablets acts as a lubricant.

**F. Teva's Fosinopril Tablets Do Not Contain "From About 0.3% To About 4% Of A Lubricant Selected From The Group Consisting Of Sodium Stearyl Fumarate And Hydrogenated Vegetable Oil"**

175. For purposes of this litigation only, Teva is not disputing that each of its

fosinopril tablets is "a stable tablet" that has "from about 1% to about 25% fosinopril sodium"; "from about 30% to about 90% of a filler"; "from about 2% to about 10% of a disintegrant"; and "from about 1% to about 5% of a binder". SF ¶ 69.

**(1) Neither Glyceryl Behenate Nor Sodium Lauryl Sulfate Is Sodium Stearyl Fumarate and Sodium Lauryl Sulfate Is Not "Hydrogenated Vegetable Oil"**

176. Neither sodium lauryl sulfate nor glyceryl behenate is sodium stearyl fumarate (SF ¶¶ 52–53).

177. Sodium lauryl sulfate is not hydrogenated vegetable oil, nor is it equivalent to hydrogenated vegetable oil. SF ¶ 51.

**(2) Glyceryl Behenate Is Not "Hydrogenated Vegetable Oil"**

178. The Glyceryl behenate NF in Teva's formulation is Compitrol®888: SF ¶ 57.

179. Bristol offered no evidence that any prior art materials actually referred to glyceryl behenate as a "hydrogenated vegetable oil." (Tr. 365:16–366:15, Klibanov).

180. By virtue of their separate listings in the USP/NF, one of ordinary skill in the art of pharmacological formulation would have understood that "hydrogenated vegetable oil" is a different composition than "glyceryl behenate". (Tr. 713:12–17, Kibbe; Jerzewski Dep. Tr. 196:24–197:7; Wong Tr. 158:2–160:5; Thakur Tr. 196:24–197:22).

181. Prior art patents referred to hydrogenated vegetable oil and glyceryl behenate as two separate materials, without regard to whether the materials met the USP/NF definition or specifications. (JTX 88; DTX 65; DTX 33; Tr. 346:3–347:17, 347:21–349:20, Klibanov).

182. Prior art references discussing glyceryl behenate do not refer to glyceryl behenate as a species or type of hydrogenated vegetable oil. (JTX 68; JTX 72; DTX 43; JTX 26g)(Tr. 352:8–12, 352:24–354:21, Klibanov).

183. Authoritative texts refer to hydrogenated vegetable oil and glyceryl behenate as separate materials, and do not refer to glyceryl behenate as a species or type of hydrogenated vegetable oil. (PTX 14; JTX 94; Tr. 359:13–361:15, Klibanov).

184. When glyceryl behenate was introduced, it was referred to as a new lubricant—not as a new form of hydrogenated vegetable oil. (JTX 26g, PTX14).

185. The Court has found that a person of ordinary skill in the art of pharmaceutical formulation as of July 10, 1989 would understand "hydrogenated vegetable oil" as listed in Claim 1 to be: "refined, bleached, hydrogenated, and deodorized vegetable oil stearins consisting mainly of the triglycerides of stearic and palmitic acids." (*supra* ¶ 118).

186. The USP/NF monograph for glyceryl behenate applicable as of July 10, 1989 defines glyceryl behenate as "a mixture of glycerides of fatty acids, mainly behenic acid." (DTX 60).

187. Glyceryl behenate is composed primarily of the diglycerides of behenic acid (10–20% mono, 47–59% di, 26–38% triglyceride). (SF ¶ 54; JTX 74).

188. Behenic acid has a longer carbon chain (22) than stearic (16) or palmitic (18) acid. (Tr. 675:8–676:3, Kibbe).

189. Glyceryl behenate is not created by hydrogenating a vegetable oil. Glyceryl behenate is manufactured by heating a mixture of glycerin and behenic acid, neither of which is a vegetable oil. Glycerin is an alcohol and behenic acid is a fatty acid. (SF ¶¶ 58–59; JTX 24; 21 CFR § 184.1328).

190. The behenic acid used to manufacture glyceryl behenate is derived from hydrogenated rapeseed oil, which is obtained from the rape plant. (JTX 24; Tr.216:24–217:10, Jain; Tr. 373:2–6, Klibanov).

191. The FDA regulations published in the Code of Federal Regulations ("C.F.R.") included regulations called "GRAS" entries. GRAS is the acronym for "Substances Affirmed as Generally Recognized As Safe." (SF ¶ 56).

192. The GRAS entry published by the Food and Drug Administration distinguishes between glyceryl behenate and hydrogenated rapeseed oil. (JTX 24).

193. Therefore, the Court finds that glyceryl behenate is not "hydrogenated vegetable oil" as understood by a person of ordinary skill in the art as of July 10, 1989.

194. The Court finds that Teva's fosinopril tablets do not contain "from about 0.3% to about 4% of a lubricant selected from the group consisting of sodium stearyl fumarate and hydrogenated vegetable oil," because (1) Teva's fosinopril tablets contain two lubricants, glyceryl behenate and sodium lauryl sulfate, and (2) those two lubricants are neither sodium stearyl fumarate nor hydrogenated vegetable oil.

### G. Teva's Fosinopril Tablet Formulation Is Not Equivalent To Bristol's Formulation.

195. Neither sodium lauryl sulfate nor glyceryl behenate is equivalent to sodium stearyl fumarate (SF ¶ 52, 53).

### (1) Teva's Lubricant Combination Of Glyceryl Behenate And Sodium Lauryl Sulfate Is Not Equivalent To Hydrogenated Vegetable Oil

196. The hydrogenated vegetable oil claimed in claim 1 of the '344 patent is a water insoluble lubricant. (SF ¶ 60); (Tr. 359:13–360:17, Klibanov).

197. Teva's fosinopril tablets use a lubricant combination made up of a water-insoluble compound, glyceryl behenate, and a water-soluble compound, sodium lauryl sulfate. (See JTX 94; Tr. 677:14–678:4, 679:17–680:2, 661:3–5, Kibbe).

198. Teva's fosinopril tablets, which have a combination of lubricants totaling 6.4%, have substantially more lubricant than the upper limit of 4.0% recited in claim 1 of the '344 patent.

199. A person of ordinary skill in the art of pharmaceutical formulation would not know, without experimentation, whether substitution of 2.4% glyceryl behenate and 4.0% sodium lauryl sulfate for hydrogenated vegetable oil would result in a tablet that is both stable and adequately lubricated. (Tr. 680:16–681:2, Kibbe).

200. Teva's 6.4% lubricant combination made of glyceryl behenate and sodium lauryl sulfate is not known to be interchangeable with hydrogenated vegetable oil for use in the formulations set forth in claim 1 of the '344 patent. (Tr. 680:3–681:2, Kibbe).

201. The Teva lubricant combination serves substantially the same function as the lubricant hydrogenated vegetable oil in the '344 patent.

202. The Teva formulation is lubricated in a way that is not substantially the same as claimed in the '344 patent, because (a) Teva uses two lubricants, while claim 1 recites only one; (b) Teva uses a combination of a water insoluble lubricant (glyceryl behenate) and a water soluble lubricant (sodium lauryl sulfate) to achieve a synergistic effect, while the claimed hydrogenated vegetable oil is a water insoluble lubricant, and (c) Teva's lubricant combination, at 6.4% by weight, is well in excess of the 4% limit recited in claim 1. (Tr. 682:5–19, Kibbe).

203. The Teva formulation does not achieve substantially the same result as the use of from about 0.3% to about 4.0% hydrogenated vegetable oil because the Teva formulation prevents sticking and picking in long tableting runs whereas the use of hydrogenated vegetable oil can result in sticking in long tableting runs. Accordingly, the result of using the Teva formulation is superior to the result of using hydrogenated vegetable oil. (Tr. 683:7–11, Kibbe).

### (2) Glyceryl Behenate Is Not Equivalent to Hydrogenated Vegetable Oil

204. The '344 patent specification does not include the term "glyceryl behenate." (SF ¶¶ 64–66).

205. A person of ordinary skill in the art of pharmaceutical formulation would not know, without experimentation, whether substitution of a lubricant such as glyceryl behenate for the claimed hydrogenated vegetable oil would result in a tablet that is both stable and adequately lubricated. (Tr. 680:16–681:2, 682:20–683:6, Kibbe).

206. The '344 patent inventors experimented with as a lubricant, and did stability testing on, hydrogenated vegetable oil, sodium stearyl fumarate, and glyceryl behenate. (supra, Part I.B.).

207. In addition to testing the stability of fosinopril tablets with hydrogenated vegetable oil as a replacement for magnesium stearate, the '344 patent inventors also tested whether fosinopril tablets using glyceryl behenate instead of magnesium stearate would also improve tablet stability. (JTX 8; Trial Tr. 124:14–125:25, Jain).

208. Despite experimenting with glyceryl behenate, hydrogenated vegetable oil, and sodium stearyl fumarate as fosinopril tablet lubricants, the '344 patent inventors only claim the use of hydrogenated vegetable oil and sodium stearyl fumarate.

209. The '344 patent inventors discontinued use of glyceryl behenate as a lubricant because of the picking problems evident from the test results. (*See supra,* Part I.B.(2)).

210. The '344 patent inventors did not consider glyceryl behenate to be interchangeable with hydrogenated vegetable oil.

211. The Court finds that glyceryl behenate is not known to be interchangeable with hydrogenated vegetable oil.

## II. CONCLUSIONS OF LAW

### A. ANDA Litigation

212. The Act creates "an act of infringement" based upon the filing of an ANDA. 35 USC § 271(e)(2). The infringement inquiry focuses on the hypothetical infringement that would occur if Teva's ANDA were approved and defendant began to make and sell the drug. *Glaxo Inc. v. Novopharm Ltd.,* 110 F.3d 1562, 1569 (Fed.Cir.1997).

213. Determining patent infringement in an ANDA case is no different from determining patent infringement in a non-ANDA case. *Glaxo Inc. v. Novopharm Ltd.,* 110 F.3d at 1568 (Fed.Cir. 1997). The fact that this is an action pursuant to § 35 U.S.C. § 271(e)(2) does not lessen or shift plaintiff's usual burden of proving infringement. *Glaxo,* 110 F.3d at 1567–68, 1570.

214. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and personal jurisdiction over the parties.

215. Venue is proper in this district in accordance with 28 U.S.C. § 1391(b)

## B. Claim Construction

■ 216. A two-step process is used in the analysis of patent infringement: first, the scope of the claims are determined as a matter of law, and second, the properly construed claims are compared to the allegedly infringing device to determine, as a matter of fact, whether all of the limitations of at least one claim are present, either literally or by a substantial equivalent, in the accused device. *Teleflex, Inc. v. Ficosa North America Corp.*, 299 F.3d 1313, 1323 (Fed.Cir.2002).

■ 217. Claim construction is a matter exclusively within the province of the court and is a determination made as a matter of law. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996); *Interactive Gift Express, Inc. v. Compuserve, Inc.*, 231 F.3d 859, 865 (Fed.Cir.2000).

■ 218. The court should only construe disputed claim terms that are in controversy and only to the extent necessary to resolve the controversy. *Vivid Techs., Inc. v. American Science & Engineering, Inc.*, 200 F.3d 795, 803 (Fed.Cir. 1999).

■ 219. In construing the meaning of a disputed term, the "court must determine what the claim meant at the time the patentee filed the ['344 patent] application". The scope of a particular claim is not altered by changes in its definition or scientific developments subsequent to the application filing date. *Schering Corp. v. Amgen Inc.*, 222 F.3d 1347, 1353 (Fed.Cir. 2000).

■ 220. A disputed term must be defined in a "manner consistent with the scientific and technical context in which it is used in the patent." *AFG Indus. Inc. v. Cardinal IG Co., Inc.*, 239 F.3d 1239, 1248 (Fed.Cir.2001).

■ 221. The first step in claim construction is to determine the ordinary and customary meaning, if any, that would be attributed to the term by those skilled in the art. *Boehringer Ingelheim v. Schering–Plough Corp.*, 320 F.3d 1339, 1347 (Fed.Cir.2003); *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed.Cir.2001).

■ 222. The plain and ordinary meaning of a claim term to one of ordinary skill in the art is controlling, absent clear evidence in the specification or prosecution history that the patentee, acting as its own lexicographer, intended to use the term in a different or inconsistent way. *Teleflex Inc. v. Ficosa N. Am. Corp.* 299 F.3d 1313, 1325–26 (Fed.Cir.2002).

■ 223. A claim term should be given the full range of its ordinary and accustomed meaning as understood by a person having ordinary skill in the art, unless the patent specification and prosecution history indicate that the inventor used the term differently. *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed.Cir.2001); *Bell Comms. Research, Inc. v. Vitalink Comms.* Corp., 55 F.3d 615, 619 (Fed.Cir. 1995).

■ 224. The claims, not the specifications, provide the measure of the patentee's right to exclude. While a specification may be referred to in order to limit the claim, it can never be used to expand it. *Johnson & Johnston Assoc. Inc. v. R.E. Service Co., Inc.*, 285 F.3d 1046, 1052 (Fed.Cir.2002). However, in referencing the specifications, "courts must take extreme care when ascertaining the proper scope of the claims, lest they simultaneously import into the claims limitations that were unintended by the patentee." *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1325 (Fed.Cir.2003).

■ 225. The Court should examine the prosecution history for the patentee's intentional departure from the plain meaning of a claim term, or "to determine whether the patentee has relinquished a potential claim construction in an amendment of their claim or in an argument to overcome or distinguish a reference." *Bell,* 262 F.3d at 1268.

■ 226. Courts may look to statements made in an Information Disclosure Statement ("IDS") submitted during prosecution "to interpret the scope of the claims in a granted patent." *Ekchian v. Home Depot, Inc.,* 104 F.3d 1299, 1304 (Fed.Cir.1997).

### (1) Use of Extrinsic Evidence in Claim Construction

■ 227. If the meaning of a term is unclear from the claims, specification and prosecution history, a court may rely on extrinsic evidence such as expert and inventor testimony, dictionaries and learned treatises. *Key Pharm. v. Hercon Labs. Corp.,* 161 F.3d 709, 716 (Fed.Cir.1998). *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1584 (Fed.Cir.1996); *Markman v. Westview Instruments Inc.,* 52 F.3d 967, 980 (Fed.Cir.1995).

228. Extrinsic evidence, such as expert testimony about how those skilled in the art would interpret certain language in the claim, may be considered when appropriate as an inherent part of the process of claim construction and as an aid in arriving at the proper construction of the claim. *Tanabe,* 109 F.3d at 732; *Markman,* 52 F.3d at 979.

■ 229. A Court, however, cannot use extrinsic evidence to arrive at a claim construction that is clearly at odds with a claim construction arrived at by examination of the intrinsic evidence. *Key Pharm.,* 161 F.3d at 716.

■ 230. Technical treatises and dictionaries fall within the category of extrinsic evidence, as they do not form a part of an integrated patent document. However, courts should consult such resources at any time in order to better understand the underlying technology and may also rely on dictionary definitions when construing claim terms, as long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents. *Texas Digital,* 308 F.3d at 1203; *Vitronics,* 90 F.3d at 1584.

■ 231. Non-scientific dictionaries should be avoided in claim construction of technical terms, "lest dictionary definitions ... be converted into technical terms of art having legal, not linguistic significance." *Dow Chemical Co. v. Sumitomo Chemical Co., Ltd.,* 257 F.3d 1364, 1372 (Fed.Cir.2001)(internal citations omitted, ellipses in original).

■ 232. The Court should "consult trustworthy extrinsic evidence to ensure that the claim construction [the court] is tending to from the patent filed is not inconsistent with clearly expressed, plainly apposite, and widely held understandings in the pertinent technical field." *Pitney Bowes, Inc. v. Hewlett–Packard Co.,* 182 F.3d 1298, 1309 (Fed.Cir.1999).

### (2) Inventor Testimony

■ 233. The person of ordinary skill is a hypothetical person who is presumed to be aware of all the pertinent prior art. The actual inventor's skill is not determinative. *Custom Accessories, Inc. v. Jeffrey–Allan Industries,* 807 F.2d 955, 962 (Fed.Cir.1986).

234. Testimony against a patentee's own interest, however, is perhaps the "most persuasive extrinsic evidence." *Evans Med. Ltd. v. American Cyanamid Co.,* 11 F.Supp.2d 338, 350 (S.D.N.Y.1998),

*aff'd,* 215 F.3d 1347, 1999 WL 594310 (Fed. Cir.1999).

235. The testimony of the inventors against interest in this case is relevant and persuasive to inform the court's claim construction. *Evans,* 11 F.Supp.2d at 350; *Astra,* 222 F.Supp.2d at 455.

## C. Construction of '344 Patent

### (1) "Lubricant"

236. Bristol contends that the term "lubricant" must be limited to an excipient which, *by itself,* reduces the ejection forces during tableting of a particular pharmaceutical formulation, and which is present on the surface of the tableting mass during compression in the tablet press so that it can function in that capacity.

237. Teva asserts that one does not have to show that an excipient in a particular formulation accomplishes its lubricating function by itself.

238. While the patent does not explicitly define "lubricant," the specification defines its implicitly by its function. No additional requirement that a lubricant be able to lubricate in the absence of other lubricants is implied from the specification. (supra ¶ 121).

239. The plain and ordinary meaning of "lubricant" does not exclude excipients that function as lubricants when in combination with other lubricants. (supra ¶ 126).

240. The Court construes "lubricant" as follows: an excipient which, by itself or in combination with another excipient, reduces the ejection forces during tableting of a particular pharmaceutical formulation, and which is present on the surface of the tableting mass during compression in the tablet press so that it can function in that capacity.

### (2) "Hydrogenated Vegetable Oil"

241. Teva's proposed construction for "hydrogenated vegetable oil" is: "refined, bleached, hydrogenated, and deodorized vegetable oil stearins consisting mainly of the triglycerides of stearic and palmitic acids." (supra ¶ 101).

242. Teva based its proposed construction for "hydrogenated vegetable oil" on the definition used in the USP/NF. Teva established that the USP/NF was a technical reference widely used by pharmaceutical formulators, and that USP/NF definition served as a baseline for formulators when discussing excipients.

243. Bristol's proposed construction for "hydrogenated vegetable oil" is: (1) a mixture (2) of mono-/di- and triglycerides (3) derived or isolated from plant sources (4) whose fatty acid moieties are partially or completely hydrogenated and (5) whose fatty acid carbon chain lengths range from 12 to 22. (supra ¶ 103).

244. Bristol based its proposed construction for "hydrogenated vegetable oil" by using a general chemical dictionary and a non-scientific dictionary for definitions of the terms "hydrogenated" and "vegetable oil" and then synthesizing those definitions. (*See supra* ¶ 104). Bristol did not establish that a person of ordinary skill would look to these references to define excipients used in formulations. (*See supra* ¶ 107).

245. Teva established that a pharmaceutical formulator would look to the USP/NF monographs for the plain and ordinary definition of excipients. The testimony of the '344 patent inventors at their depositions, where they applied the USP/NF definition of "hydrogenated vegetable oil" is highly persuasive evidence that the ordinary meaning of the term for pharmaceutical formulators as of July 10, 1989 was "refined, bleached, hydrogenated,

and deodorized vegetable oil stearins consisting mainly of the triglycerides of stearic and palmitic acids."

246. Bristol's efforts to dismiss the USP/NF as simply "regulatory" are unconvincing. FDA approval is an essential part of the manufacture of pharmaceutical products and therefore that approval is an inherent part of the process of formulation. To the extent that Bristol raised any issue with excipient definitions based on the USP/NF, it is with imposing the details of specifications onto the claimed excipient, not utilizing the description of the compound, as Teva's proposed construction does.

247. Bristol provided no evidence, except the unsupported opinion of its expert, Dr. Klibanov, to suggest that a pharmaceutical formulator would instead look to a general chemical or non-scientific dictionary in defining excipients.

248. The Court therefore construes the term "hydrogenated vegetable oil" in Claim 1 as: "refined, bleached, hydrogenated, and deodorized vegetable oil stearins consisting mainly of the triglycerides of stearic and palmitic acids."

### (3) "A" Lubricant

249. Teva asserts that "a lubricant" limits the claim to a sole lubricant. Therefore, according to Teva, the presence of a second lubricant in a formulation places it outside the scope of the claim.

250. Bristol contends that "a lubricant" should not be construed as "sole lubricant" and therefore a formulation is not outside the scope of the claim simply because it uses more than one lubricant.

251. This dispute is only relevant if the Court found that (1) glyceryl behenate is "hydrogenated vegetable oil" and (2) sodium lauryl sulfate acts as a lubricant. As the Court has found that glyceryl behenate

is not "hydrogenated vegetable oil" (see supra, Part I.F.(2); infra ¶ 261), resolving this disputed construction of the claim is not necessary to the determination of infringement. See Vivid Techs., 200 F.3d at 803.

### (4) "Comprising ... a lubricant selected from a group consisting of ..."

252. A "Markush" formulation permits a patentee to define a "material" by reference to an artificial group where no generic description exists to embrace that group and that group only. 3 Chisum on Patents § 8.06[2][c] (2002). Claim 1 of the '344 patent contains the following Markush formulation: "a lubricant selected from a group consisting of sodium stearyl fumarate and hydrogenated vegetable oil." Therefore, Claim 1 has a Markush group composed of sodium stearyl fumarate and hydrogenated vegetable oil.

253. Teva asserts that this language excludes all lubricants that are not within the Markush group, and therefore a lubricant combination composed of one lubricant within the group and one lubricant outside the group would fall outside the scope of the claim.

254. Bristol asserts that "comprising" signals that the claim is open ended, and as long as one of the lubricants in a lubricant combination fell within the Markush group, the combination would be within the scope of the claim.

255. This dispute is only relevant if the Court found that (1) glyceryl behenate is "hydrogenated vegetable oil" and (2) sodium lauryl sulfate acts as a lubricant. As the Court has found that glyceryl behenate is not "hydrogenated vegetable oil" (see supra Part I.F.(2); infra ¶ 261), resolving this disputed construction of the claim is not necessary to the determination of in-

fringement. *See Vivid Techs.*, 200 F.3d at 803.

### (5) "From About 0.3 To About 4.0% of A Lubricant"

256. Bristol asserts that if a formulation uses a claimed lubricant in combination with an unclaimed lubricant, the percentage of the "lubricant" for purposes of this term is solely the claimed lubricant.

257. Teva asserts that the percentage of the "lubricant" for purposes of this term is the total of the lubricant combination.

258. This dispute is only relevant if the Court found that (1) glyceryl behenate is "hydrogenated vegetable oil" and (2) sodium lauryl sulfate acts as a lubricant. As the Court has found that glyceryl behenate is not "hydrogenated vegetable oil" (*see supra* Part I.F.(2); *infra* ¶ 261), resolving this disputed construction of the claim is not necessary to the determination of infringement. *See Vivid Techs.*, 200 F.3d at 803.

### D. Literal Infringement

259. To establish literal infringement, the patentee must establish that every limitation set forth in the properly construed claim reads on, or in other words is found in, the accused product, exactly. *Allen Engineering Corp., v. Bartell Indus., Inc.* 299 F.3d 1336, 1345 (Fed. Cir.2002); *Southwall Technologies, Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1575 (Fed. Cir.1995), *cert. denied*, 516 U.S. 987, 116 S.Ct. 515, 133 L.Ed.2d 424 (1995).

260. Applying the Court's construction of "lubricant" for Claim 1 of the '344 patent, the Court concludes that the sodium lauryl sulfate in Teva's formulation is a "lubricant."

261. Applying the claim construction of "hydrogenated vegetable oil" for Claim 1 of the '344 patent, the Court concludes

that the glyceryl behenate in Teva's formulation is not "hydrogenated vegetable oil."

262. The Court finds that Teva's fosinopril tablet formulation does not literally infringe claim 1 of the '344 Patent. Teva's formulation contains two lubricants, glyceryl behenate and sodium lauryl sulfate, neither of which is one of the lubricants, sodium stearyl fumarate and hydrogenated vegetable oil, claimed by the '344 Patent.

### E. Doctrine of Equivalents

263. Infringement under the doctrine of equivalents requires that the accused product contain each limitation of the claim or its equivalent. *Eagle Comtronics, Inc. v. Arrow Commun. Labs., Inc.*, 305 F.3d 1303, 1315 (Fed.Cir.2002).

264. The doctrine of equivalents is not applied to the invention as a whole, but to individual elements of the claimed invention. *Warner–Jenkinson Co. v. Hilton Chem. Co.*, 520 U.S. 17, 29, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997).

265. The particular linguistic framework used to determine equivalence is less important than whether the test examines if the accused product contains elements identical on equivalent to each claimed element of the patented invention. *Warner–Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 40, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997).

266. The patentee must prove that the difference between the claim element and what is found in the accused product is only minor or insubstantial. *Sage*, 126 F.3d at 1423–24; *Allen Engineering* 299 F.3d at 1345.

267. An element in the alleged infringer's product is equivalent to a claimed element when the differences be-

tween the two are insubstantial to one of ordinary skill in the art. *Eagle Comtronics, Inc. v. Arrow Commun. Labs., Inc.,* 305 F.3d 1303, 1315 (Fed.Cir.2002). *Toro Co. v. White Consol. Indus., Inc.,* 266 F.3d 1367, 1370 (Fed.Cir.2001).

#### (1) Function–Way–Result Test

**■** 268. Courts have employed a tripartite function-way-result test to determine whether a change is "insubstantial." The function-way-result test inquires into whether the element in the accused product performs substantially the same function in substantially the same way to achieve substantially the same result. *Warner–Jenkinson Co. v. Hilton Davis Chem. Co.,* 520 U.S. 17, 39–40, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997).

269. There is substantial agreement that while the function-way-result test may be suitable for analyzing mechanical devices, it often provides a poor framework for analyzing other products. *Warner–Jenkinson Co. v. Hilton Davis Chem. Co.,* 520 U.S. 17, 39–40, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997).

270. However, each case is different and the function-way-result test may be appropriate depending on the particular facts of the case. *Boehringer Ingelheim v. Schering–Plough Corp.,* 320 F.3d 1339, 1351 (Fed.Cir.2003) (applying the function way result analysis to determine whether a virus was the equivalent of another virus).

271. In a function-way-result analysis, the function, way, and result should not overlap greatly nor be too broad. *Insituform Tech., Inc. v. Cat Contracting, Inc.,* 161 F.3d 688, 693 (Fed.Cir.1998).

272. This Court has found that Teva's lubricant combination serves the same function—lubrication—as hydrogenated vegetable oil in the '344 patent. (supra ¶ 201).

273. This Court has found that Teva's lubricant combination does not lubricate in substantially the same way, nor does it achieve substantially the same result. (supra ¶ 202–203).

274. Therefore, applying the function-way-result test, the Court concludes that Teva's formulation does not infringe the '344 patent by way of the doctrine of equivalents.

#### (2) Known Interchangeability

**■** 275. The use of a substitute with "known interchangeability" with a literally claimed element is an objective factor to be considered in determining whether the substitute meets the claim element under the doctrine of equivalents. *Warner–Jenkinson Co. v. Hilton Davis Chem. Co.,* 520 U.S. 17, 36, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997).

276. The "known interchangeability" test looks to the knowledge of the skilled artisan to see whether the artisan would "contemplate the interchange as a design choice." Such evidence is "substantial evidence" of equivalence. *Interactive Pictures Corp. v. Infinite Pictures, Inc.,* 274 F.3d 1371, 1383 (Fed.Cir.2001).

277. Pre-application experiments are properly considered by the court in assessing whether there is a substantial difference between what is claimed and what is accused of infringing under the doctrine of equivalents. *Tanabe,* 109 F.3d at 733.

278. Unsuccessful experiments suggest that the inventors did not consider what was experimented with to be interchangeable with what was claimed. *Tanabe,* 109 F.3d at 733.

279. The inventors of the '344 patent did not even consider glyceryl behenate as a sole lubricant to be interchangeable with hydrogenated vegetable oil. (supra ¶ 218).

280. Teva's lubricant combination of sodium lauryl sulfate and glyceryl behenate is not known to be interchangeable with hydrogenated vegetable oil. (supra ¶¶ 199–200).

281. Therefore, applying the "known interchangeability" test, the Court concludes that Teva's formulation does not infringe the '344 patent by the doctrine of equivalents.

## III. CONCLUSION

For the reasons set forth in the findings of fact and conclusions of law above, this Court finds that Teva's proposed fosinopril formulation does not infringe the '344 patent by means of either literal infringement or pursuant to the doctrine of equivalents. Accordingly, plaintiff's claim is dismissed with prejudice.